**14-1274, 1277**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆─◆─◆

MOMENTA PHARMACEUTICALS, INC. and SANDOZ INC.,

*Plaintiffs-Appellants,*

— v. —

TEVA PHARMACEUTICALS USA, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
JUDGE NATHANIEL M. GORTON
10-CV-12079

## BRIEF OF DEFENDANT-APPELLEE
## TEVA PHARMACEUTICALS USA, INC.
## [NON-CONFIDENTIAL]

DAVID M. HASHMALL
JOSHUA A. WHITEHILL
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

HENRY C. DINGER
JAMES REHNQUIST
ELAINE H. BLAIS
EMILY L. RAPALINO
ROBERT FREDERICKSON III
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, Massachusetts 02109
(617) 571-1000

*Counsel for Defendant-Appellee*
*Teva Pharmaceuticals USA, Inc.*

September 25, 2014

## CERTIFICATE OF INTEREST

I, Henry C. Dinger, Counsel for Defendant-Appellee Teva Pharmaceuticals USA, Inc., certify that:

1.    The full name of the party that I represent is Teva Pharmaceuticals USA, Inc.

2.    The real party in interest is the same as the party I represent.

3.    The parent corporations and the publicly held companies that currently own 10% or more of the stock of the party that I represent are:

> Orvet UK Unlimited, Teva Pharmaceutical Holdings Coöperatieve U.A., Ivax LLC (f/k/a IVAX Corporation), Teva Pharmaceuticals Europe, B.V., and Teva Pharmaceutical Industries Ltd.; Teva Pharmaceutical Industries Ltd. is the only publicly traded company that owns 10% or more of Teva Pharmaceuticals USA, Inc.

4.    The names of all law firms and their partners or associates who appeared for Teva Pharmaceuticals USA, Inc. in the lower tribunal, or who are expected to appear for Teva Pharmaceuticals USA, Inc. in this Court are:

> GOODWIN PROCTER LLP
> David M. Hashmall, Esq.
> Henry C. Dinger, Esq.
> Elaine H. Blais, Esq.
> James Rehnquist, Esq.
> Emily L. Rapalino, Esq.
> Robert Frederickson, III;
> Joshua A. Whitehill, Esq.
> *Daniel B. Reagan, Esq.
> *Adam R. Wichman, Esq.

    * No longer with firm

Dated:  September 25, 2014                    /s/  Henry C. Dinger
                                             Henry C. Dinger

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ......................................................................v

TABLE OF ABBREVIATIONS ..................................................................x

STATEMENT OF RELATED CASES ........................................................1

STATEMENT OF ISSUES .........................................................................3

STATEMENT OF THE CASE......................................................................4

I.     Background of this Appeal .................................................................4

     A.    Lovenox® and Its Generic Equivalents ................................4

     B.    Enoxaparin..............................................................................4

     C.    Teva's ANDA..........................................................................5

     D.    The '886 Patent .....................................................................6

II.    Procedural History ...........................................................................8

     A.    Momenta sues Teva based on its use of the 1,6-Anhydro Release Test.............................................................................8

     B.    Momenta sues Amphastar and blocks Amphastar's launch. ...................................................................................9

     C.    In *Momenta I*, this Court ruled that the 1,6-Anhydro Release Test was exempt from infringement under the Section 271(e)(1) safe-harbor............................................10

     D.    Teva prevails on its motion for summary judgment of non-infringement.................................................................11

     E.    After Teva moves for summary judgment, Momenta unsuccessfully tries to accuse a second release test of infringing the '886 patent.................................................16

SUMMARY OF ARGUMENT ..................................................................18

ARGUMENT .............................................................................................20

I.     Standard of Review........................................................................20

II.    Teva's proposed generic enoxaparin product is not "made by" the method claimed in the '886 patent and therefore its importation will not infringe under 35 U.S.C. § 271(g)................................21

III.    The importation and sale of Teva's proposed generic enoxaparin product will not constitute infringement under § 271(g) because any use of Momenta's claimed method falls within the safe harbor of 35 U.S.C. § 271(e)(1)............................................27

    A.    Because § 271(g) only applies if practicing the claimed method would infringe a valid process patent, application of § 271(e)(1) to Chemi's alleged use of Momenta's claimed method precludes any liability under § 271(g).....................28

    B.    The use of a patented method specifically directed to generating information that must be submitted to the FDA upon demand is protected by 35 U.S.C. § 271(e)(1). ................33

        1.    There is no occasion for the panel in this case to reconsider the ruling in *Momenta I*.........................................33

            a.    Momenta is collaterally estopped from challenging the legal ruling in *Momenta I*.......................33

            b.    The panel is bound to accept the legal rulings of *Momenta I* unless and until they are overturned by the Supreme Court or this Court en banc.................................................................40

        2.    The alleged use of the claimed method falls within § 271(e)(1)'s safe harbor because it is employed solely for uses reasonably related to the development and submission of information under federal law governing pharmaceuticals. ....................................42

            a.    Because the information generated by the alleged use of the patented method must be maintained for submission to FDA on demand, it is "reasonably related" to the submission of information to FDA under federal law. ....................................................................43

            b.    Teva's alleged practice of the method claimed by the '886 patent was "solely" for a use reasonably related to the development and submission of information under federal

law, regardless of whether the information developed was used for additional purposes. ................45

    c.    Application of § 271(e)(1) in this case will not broadly exempt defendants from infringement liability for commercial manufacturing. ................................................48

IV.    The District Court did not abuse its discretion in denying Momenta leave to file a surreply to respond to Teva's "made by" arguments. ...........................................51

    A.    Momenta was not entitled to file a surreply because Teva's arguments were made only in response to theories raised for the first time in Momenta's opposition to Teva's motion. ...................................51

    B.    Momenta argued all of the matters raised in its surreply at oral argument on Teva's summary judgment motion. ...................52

V.    The District Court did not abuse its discretion in denying Momenta's belated attempt to amend its infringement contentions for a third time. ...........................................54

    A.    The District Court correctly found that Momenta's proposed amendment would have been futile. ...................................55

    B.    The District Court properly rejected Momenta's Third Amended Contentions because Momenta unreasonably delayed filing them. ...........................................56

CONCLUSION ...........................................59

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIAL

Materials that were made confidential pursuant to the protective order have been shaded in the confidential version of the brief and redacted from the non-confidential version of the brief.  These materials include confidential business information from documents and exhibits filed in the District Court.

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Abbott Labs. v. Andrx Pharm., Inc.*,
    473 F.3d 1196 (Fed. Cir. 2007) ............................................................37, 38, 39

*Abbvie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
    759 F.3d 1285 (Fed. Cir. 2014) ............................................................34

*Abraham v. Woods Hole Oceanographic Inst.*,
    553 F.3d 114 (1st Cir. 2009)................................................................55

*Abtox, Inc. v. Exitron Corp.*,
    122 F.3d 1019 (Fed. Cir. 1997) ............................................................46

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) ............................................................21, 53

*Amgen, Inc. v. ITC*,
    565 F.3d 846 (Fed. Cir. 2009) ............................................................30

*Aventis Pharma S.A. v. Amphastar Pharm., Inc.*,
    525 F.3d 1334 (Fed. Cir. 2008) ............................................................4, 48

*Banner Health v. Sebelius*,
    905 F. Supp. 2d 174 (D.D.C. 2012)......................................................52

*Bayer AG v. Housey Pharm., Inc.*,
    340 F.3d 1367 (Fed. Cir. 2003) ............................................23, 24, 25, 26, 30

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996) ............................................................25

*Celotex Corp. v. Cartrett*,
    477 U.S. 317 (1986)............................................................................53

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
    754 F.2d 404 (1st Cir. 1985)................................................................53

*Classen Immunotherapies, Inc. v. Biogen Idec*,
    659 F.3d 1057 (Fed. Cir. 2011) ............................................................41

*Clear Channel Outdoor, Inc. v. Mayor & City Counsel of Baltimore*,
No. GLR-13-2379, 2014 WL 2094028 (D. Md. May 19, 2014)........................51

*Conroy v. Vilsack*,
707 F.3d 1163 (10th Cir. 2013) ............................................................53

*Ferring B.V. v. Watson Labs., Inc.–Florida*,
No. 14-1416, 2014 WL 4116461 (Fed. Cir. Aug. 22, 2014) .............................32

*Fortinet, Inc. v. Palo Alto Networks, Inc.*,
No. C-09-00036 RMW, 2010 WL 4608250 (N.D. Cal. Nov. 5, 2010).............55

*Foster v. Hallco Mfg. Co.*,
947 F.2d 469 (Fed. Cir. 1991) ............................................................34

*Glaxo Group Ltd. v. Apotex, Inc.*,
376 F.3d 1339 (Fed. Cir. 2004) .....................................................34, 35

*Granite Mgmt. Corp. v. United States*,
416 F.3d 1373 (Fed. Cir. 2005) ............................................................56

*House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co.*,
775 F. Supp. 2d 296 (D. Mass. 2011)..............................................58, 59

*In re Papst Licensing GmbH & Co. KG Litig.*,
767 F. Supp. 2d 1 (D.D.C. 2011)........................................................57

*Int'l Commc'n Materials, Inc. v. Ricoh Co.*,
108 F.3d 316 (Fed. Cir. 1997) ............................................................35

*Lummus Co. v. Commonwealth Oil Ref. Co.*,
297 F.2d 80 (2d Cir. 1961) (Friendly, J.) .............................................37

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
545 U.S. 193 (2005)..............................................................43, 44, 45

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007)..........................................................................21

*Miller Brewing Co. v. Falstaff Brewing Corp.*,
655 F.2d 5 (1st Cir. 1981)...................................................................36

*Miller Brewing Co. v. G. Heileman Brewing Co.*,
  561 F.2d 75 (7th Cir. 1977) ...............................................................36

*Miller Brewing Co. v. Jos. Schlitz Brewing Co.*,
  605 F.2d 990 (7th Cir. 1979) ........................................................36, 37

*Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*,
  686 F.3d 1348 (Fed. Cir. 2012) .................................................passim

*Monsanto Co. v. Syngenta Seeds, Inc.*,
  503 F.3d 1352 (Fed. Cir. 2007) ........................................................31

*Mycogen Plant Science, Inc. v. Monsanto Co.*,
  252 F.3d 1306 (Fed. Cir. 2001) ........................................................31

*Naser Jewelers, Inc. v. City of Concord*,
  538 F.3d 17 (1st Cir. 2008)................................................................39

*Novo Nordisk of N. Am. v. Genentech, Inc.*,
  77 F.3d 1364 (Fed. Cir. 1996) ..........................................................31

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2013) ........................................................24

*O'Connell v. Hyatt Hotels of P.R.*,
  357 F.3d 152 (1st Cir. 2004)..............................................................21

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  467 F.3d 1355 (Fed. Cir. 2006) ........................................................57

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*,
  695 F.3d 1285 (Fed. Cir. 2012) ........................................................39

*Oxford Aviation, Inc. v. Global Aerospace, Inc.*,
  680 F.3d 85 (1st Cir. 2012)................................................................56

*Phillip M. Adams & Assocs., LLC v. Dell Computer Corp.*,
  519 F. App'x 998 (Fed. Cir. 2013) ..............................................24, 26

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*,
  490 F.3d 86 (1st Cir. 2007)................................................................34

vii

*Seay v. Tenn. Valley Auth.*,
  339 F.3d 454 (6th Cir. 2003) .............................................................53

*Speedtrack, Inc. v. Endeca Techs., Inc.*,
  524 F. App'x 651 (Fed. Cir. 2013) ....................................................20

*Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*,
  948 F.2d 1258 (Fed. Cir. 1991) .........................................................56

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*,
  982 F.2d 1520 (Fed. Cir. 1992) .................................................46, 47

*Tex. Am. Oil Corp. v. U.S. Dep't of Energy*,
  44 F.3d 1557 (Fed. Cir. 1995) ...........................................................40

*Thibeault v. Square D Co.*,
  960 F.2d 239 (1st Cir. 1992) ..............................................................21

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) .....................................................................34, 35

*Walsh v. Int'l Longshoremen's Ass'n*,
  630 F.2d 864 (1st Cir. 1980) ..............................................................38

*Warner-Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003) .........................................................20

## STATUTES

21 U.S.C.
  § 321(j) .............................................................................................5
  § 331(a) .............................................................................................5
  § 351(b) .............................................................................................5

28 U.S.C. § 1291 ..................................................................................37

35 U.S.C.
   § 112 ..............................................................................................8
   § 154(a)(1) ...................................................................................21
   § 271(a) ........................................................................................21
   § 271(e)(1) ............................................................................passim
   § 271(e)(2) ...................................................................................32
   § 271(g) ................................................................................passim
   § 271(g)(2) ...................................................................................26

## OTHER AUTHORITIES

21 C.F.R.
   § 211.110(a) ................................................................................27
   § 211.180(c) .................................................................................44
   § 211.188(b) ................................................................................12
   § 211.194(a) ................................................................................12

D. Mass. L. Civ. R. 16.1(g) .............................................................57

Fed. R. Civ. P.
   15(a) ...........................................................................................56
   15(c) ...........................................................................................56
   16(b) ...........................................................................................57

H.R. Rep. 100-60, 100th Cong., 1st Sess. (Apr. 22, 1987) .........................30

RESTATEMENT (SECOND) OF JUDGMENTS § 27 .........................................34

S. Rep. 100-83, 100th Cong., 1st Sess. (June 23, 1987) ............................29

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '886 patent | U.S. Patent No. 7,575,886 |
| Amphastar | Amphastar Pharmaceuticals, Inc, International Medication Systems, Ltd., Actavis, Inc., and Actavis Pharma, Inc. (formerly known as Watson Pharma, Inc.), collectively |
| ANDA | Abbreviated New Drug Application |
| Blue Br. | Brief for Plaintiffs-Appellants Momenta Pharamceuticals, Inc. and Sandoz Inc. in this appeal |
| Chemi | Chemi S.p.A. |
| FDA | U.S. Food and Drug Administration |
| Momenta | Appellants Momenta Pharmaceuticals, Inc. and Sandoz Inc., collectively |
| Teva | Appellee Teva Pharmaceuticals USA, Inc. |
| USP | U.S. Pharmacopeia |

## STATEMENT OF RELATED CASES

Momenta previously appealed to this Court from the District Court's July 19, 2013 Order & Memorandum of summary judgment, before judgment was final. This Court dismissed that appeal for lack of jurisdiction.  *See* Case No. 13-1580, ECF No. 26.

The Court's decision in this appeal may directly affect or be directly affected by this Court's decision in *Momenta Pharmaceuticals, Inc. v. Amphastar Pharmaceuticals, Inc.*, consolidated Case Nos. 14-1276 and -1278, which this Court is treating as a companion to this case for oral argument.  The *Amphastar* case is an appeal from a judgment in a related case, Civil Action No. 11-11681-NMG (D. Mass.), brought before the same district judge with the same plaintiffs and patents as this case.  Although the parties to these two cases coordinated certain proceedings (*e.g.*, claim construction proceedings, some fact discovery, and the summary judgment hearing), the District Court never formally consolidated the cases.  The District Court's summary judgment opinion in this case, A1-A9, incorporates by reference portions of its corresponding summary judgment opinion from the *Amphastar* case, A4849-A4863.

The parties in the *Amphastar* case previously appealed to this Court from orders entered by the District Court.  In consolidated Case Nos. 12-1062, -1103, and -1104, this Court vacated the District Court's preliminary injunction against

1

the *Amphastar* defendants and remanded for further proceedings.  *See Momenta*

*Pharm., Inc. v. Amphastar Pharm., Inc.*, 686 F.3d 1348 (Fed. Cir. 2012).

## STATEMENT OF ISSUES

1.  Did the District Court correctly reject Momenta's claim under 35 U.S.C.

    § 271(g) where Teva's alleged use of the method claimed in the '886 patent

    played no part in the synthesis of any product to be sold in the U.S.?

2.  Did the District Court correctly decide to follow this Court's earlier ruling that

    the alleged use of the method claimed in the '886 patent to generate information

    that under FDA regulations was required to be maintained and submitted on

    demand to the FDA was encompassed within the safe harbor of 35 U.S.C.

    § 271(e)(1)?

3.  Did the District Court abuse its discretion by (a) denying Momenta leave to

    submit a surreply brief in opposition to Teva's motion for summary judgment

    where it permitted Momenta to raise its surreply positions at oral argument, or

    (b) declining to permit Momenta to file a third amended set of infringement

    contentions that was both futile and unreasonably delayed?

## STATEMENT OF THE CASE

### I.     Background of this Appeal

#### A.     Lovenox[®] and Its Generic Equivalents

This is a patent infringement suit between drug manufacturers competing in the market for generic formulations of the drug Lovenox[®].  A1.  Lovenox[®] is an FDA-approved injectable anticoagulant that is prescribed to prevent blood clots. *Id*.  Lovenox[®] contains enoxaparin sodium as its active pharmaceutical ingredient ("API").  Momenta launched the first generic enoxaparin product in 2010.[1]  *Id*.  In early 2012, Amphastar launched its own generic enoxaparin product.  A4850-A4851.  FDA recently approved Teva's ANDA for another generic enoxaparin product.

#### B.     Enoxaparin

Enoxaparin is a substance belonging to a class of sugars known as low-molecular weight heparins ("LMWHs").  A2595-A2599.  LMWHs are derivatives of heparin, a naturally occurring mixture of long-chain sugar molecules ("polysaccharides") of varying lengths and structures.  *Id*.  LMWHs are synthesized from heparin through a process called depolymerization, which breaks

---

[1]     In 2008, the path for such generic products opened when the patent covering enoxaparin itself was found unenforceable.  *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d 1334 (Fed. Cir. 2008).

down heparin's polysaccharide chains into shorter chains ("oligosaccharides"). *Id*. That process produces a complex mixture of oligosaccharides of varying lengths and structures. *Id*.

The composition of a particular LMWH depends on the depolymerization process that is used to break down the heparin. *Id*. The depolymerization process used to make enoxaparin results in a unique chemical modification known as a 1,6-anhydro ring structure at the terminal ends of some of the oligosaccharide chains. A2591; A2598.

### C.    Teva's ANDA

On April 25, 2003, Teva submitted an abbreviated new drug application to market a generic enoxaparin product in the United States. A2519. Teva imports its product from Italy, where another company, Chemi, makes and tests it. A2515; A3489. It is undisputed that all manufacturing, analysis, quality control testing, packaging, and labeling of Teva's enoxaparin product takes place in Italy. *Id*.

FDA requires manufacturers of generic enoxaparin to test their products to ensure that they comply with the USP monograph for enoxaparin. Blue Br. at 11; A2512-A2513; A2563-A2564; A3481. Federal law prohibits the sale of any generic enoxaparin that does not meet those requirements. *See* 21 U.S.C. §§ 321(j), 331(a), 351(b). Accordingly, Chemi must perform several quality control tests on samples from each batch of enoxaparin before the batch can be

5

released for sale in the United States. A2519-A2529. These "release tests" are performed after the enoxaparin API itself has been manufactured. A2513; A3481; A2526. One of those FDA-mandated release tests for enoxaparin ensures that 15%-25% of the sugar chains in samples derived from each batch of enoxaparin contain a 1,6-anhydro ring structure ("the 1,6-Anhydro Release Test"). A2520-A2529; A2586-A2689. Momenta alleges that performing this release test infringes the '886 patent.

After the enoxaparin "passes" all FDA-required release tests, Chemi places it into syringes for export to the United States. A2526. Chemi is required by FDA to maintain the results of its release testing, which must be readily available for inspection or review by FDA. A2513; A2522-A2523; A2526; A3481-A3484; A3490-A3491.

### D.    The '886 Patent

The '886 patent, titled, "Analysis of Sulfated Polysaccharides," "generally relates to the identification of a structural signature of a low molecular weight heparin known as 'enoxaparin sodium.'" A21; A97 ¶ 10. Momenta's '886 patent does not claim enoxaparin, a product containing enoxaparin, or a process for synthesizing enoxaparin. Rather, the claims of the '886 patent are exclusively directed to methods for analyzing a pre-existing sample of enoxaparin. A69-73;

A98 ¶ 18.  Claim 53, which the parties agree is representative (A1748; A2307;

A3504-A3505), states:

> 53. A method for analyzing an enoxaparin sample for the presence or amount of a non naturally occurring sugar associated with peak 9 of FIG. 1 that results from a method of making enoxaparin that included β-eliminative cleavage with a benzyl ester and depolymerization, comprising:
>
> [1]  providing an enoxaparin sample that has been exhaustively digested with two or more heparin degrading enzymes;
>
> [2]  using a separation method to determine, in the enoxaparin sample that has been contacted with two or more heparin degrading enzymes, the presence of a structural signature associated with the non naturally occurring sugar associated with peak 9 of FIG. 1 that results from a method of making enoxaparin that includes β-eliminative cleavage with a benzyl ester and depolymerization;
>
> [3]  making a determination about the enoxaparin sample based upon a comparison of the determination of the presence of a structural signature associated with the non naturally occurring sugar associated with peak 9 to a reference standard for enoxaparin; and
>
> [4]  selecting a batch of enoxaparin based upon a comparison of the determination of the presence of the structural signature associated with the non naturally occurring sugar associated with peak 9 of FIG. 1 to a reference standard for enoxaparin,
>
> to thereby analyze the enoxaparin sample.

A72 (numbering added).

Although the term "1,6-anhydro" appears nowhere in the '886 patent, Momenta has alleged that the "non naturally occurring sugar associated with peak 9 of FIG. 1" is an oligosaccharide with a 1,6-anhydro ring structure. A2537; A2549. Even if that allegation were correct,[2] claim 53 by its very terms is a method for testing an "exhaustively digested" "enoxaparin sample" for the presence or amount of the 1,6-anhydro derivative structure "that results from a method of making enoxaparin." A72. That means that before any step of the claimed test method is performed, a batch of enoxaparin must already be synthesized from heparin, and a sample removed from the batch and exhaustively digested by multiple enzymes so that it is no longer enoxaparin. A7.

## II.    Procedural History

### A.    Momenta sues Teva based on its use of the 1,6-Anhydro Release Test.

On December 2, 2010, Momenta sued Teva in the District of Massachusetts for infringement of the '886 patent. A95-A105. From the filing of its case through

---

[2]    Teva does not concede this point. Moreover, in the District Court, Teva has challenged the validity of the claims of the '886 patent for violating, *inter alia*, the written description, enablement, and definiteness requirements of 35 U.S.C. § 112 because, although the '886 patent identifies the sugars associated with peaks 1-8, it neither identifies the sugar or structural signature associated with peak 9 nor enables a POSA to derive that information without undue experimentation. However, neither the non-conformity of Chemi's 1,6-anhydro test to the claimed method nor the validity of any claims of the '886 patent need be addressed in this appeal.

the close of fact discovery two years later — a period during which Momenta

served three sets of infringement contentions — the only act of infringing that

patent alleged by Momenta was Chemi's use of the 1,6-Anhydro Release Test.[3]

A2740-A2741; A2779-A2819.

### B.    Momenta sues Amphastar and blocks Amphastar's launch.

While Momenta's case against Teva was pending, Amphastar received

FDA-approval to market its own generic version of Lovenox®.  On September 21,

2011, Momenta sued Amphastar in the District of Massachusetts, alleging that

Amphastar's method of testing its generic enoxaparin infringed the '886 patent.

*Momenta Pharm. v. Amphastar Pharm. et al.,* No. 11-11681-NMG (D. Mass.)

("*Amphastar*").[4]  Shortly thereafter, Momenta sought and obtained a preliminary

---

[3]    On March 31, 2011, the district court entered a scheduling order that required Momenta to serve its infringement contentions on April 15, 2011, and also provided that "[s]uch disclosures may be amended and supplemented up to 30 days before the date of the Markman Hearing."  A587-A596 ¶ 2(c).  "After that time, such disclosures may be amended or supplemented only to the extent permitted by this Order or by leave of court, for good cause shown."  *Id.*  The scheduling order further provided that "[i]f necessary, the parties may amend their preliminary infringement/non-infringement and invalidity disclosures, noting whether any infringement or invalidity contentions are withdrawn, **within 30 days after the Court's ruling on claim construction**."  *Id.* ¶ 2(l) (emphasis in original).  The district court held a *Markman* hearing on May 4, 2012 (A2112-A2116) and issued its claim construction ruling on June 27, 2012 (A2300-A2347).  Fact discovery closed on July 19, 2012.  A2297-A2299.

[4]    Momenta's allegations against Amphastar are identical to the allegations against Teva, save for the recognition that Teva's generic enoxaparin is manufactured and tested in Italy, whereas Amphastar's product is tested in the

(*continued next page*)

9

injunction against Amphastar based on the allegations that FDA required generic

enoxaparin manufacturers like Amphastar to perform a 1,6-anhydro release test,

which, according to Momenta, infringed the '886 patent.  Amphastar appealed.

**C.     In *Momenta I*, this Court ruled that the 1,6-Anhydro Release Test was exempt from infringement under the Section 271(e)(1) safe-harbor.**

On August 3, 2012, this Court vacated the preliminary injunction against

Amphastar, and ruled that Amphastar's 1,6-anhydro quality control release testing

fell within 35 U.S.C. § 271(e)(1)'s safe-harbor.  *Momenta Pharm., Inc. v.*

*Amphastar Pharm., Inc.*, 686 F.3d 1348 (Fed. Cir. 2012) ("*Momenta I*").  This

Court held as a matter of law that "[u]nder a proper construction of 35 U.S.C.

§ 271(e)(1), the fact that Amphastar's testing is carried out to 'satisfy the FDA's

requirements' means it falls within the scope of the safe harbor, even though the

activity is carried out after approval."  *Id.* at 1359.  The Court suggested that the

District Court "consider whether Momenta's admission that Amphastar's use of

the patented invention is to 'satisfy the FDA's requirement' makes this case

---

United States.  Although the District Court directed the coordination of certain
proceedings in the two cases (*e.g.*, claim construction proceedings, parts of fact
discovery, and oral argument on the defendants' summary judgment motions), the
two cases were never consolidated.  The separate appeals from the two judgments
against Momenta have been designated as companion cases but are being
separately briefed.

amenable to summary judgment of non-infringement in favor of Amphastar." *Id.*
at 1361.

Recognizing that the same issues were presented in *Momenta I* and in this
case, the District Court stayed the *Teva* case, pending resolution of Momenta's
petitions for rehearing and certiorari, A2417, both of which were denied.  *See* Fed.
Cir. Case No. 12-1062, ECF Nos. 4, 7.

### D.    Teva prevails on its motion for summary judgment of non-infringement.

On January 31, 2013, Teva moved for judgment on the pleadings or, in the
alternative, summary judgment of non-infringement.  A2487-A2489.  Teva relied
on undisputed facts demonstrating that *Momenta I* applied equally to the claim
against Teva.  A2491-A2530.

First, the FDA requires Teva, like Amphastar, to perform a 1,6-Anhydro
Release Test in order to obtain and maintain FDA-approval.  A2512-A2518 ¶¶ 1-4,
11-17; A3481-3492 ¶¶ 1-4, 11-17.  Both FDA and the USP require proof that
between 15%-25% of the sugars in each batch of generic enoxaparin have a 1,6-
anhydro structure at their reducing ends.  A3719.  ████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████  Momenta has
repeatedly admitted that the 15%-25% property is an FDA requirement.  *See, e.g.*,
A2782 ("The FDA requires that batches of generic enoxaparin drug substance

11

manufactured by or for a seller of generic enoxaparin conform to the reference standard that between 15% and 25% of its oligosaccharide chains in the production batch include, at their reducing ends, a non-naturally occurring sugar that includes a 1,6-anhydro ring structure."); A2799 (same); A3504 ("I understand that FDA currently requires that, as stated in the United States Pharmacopeia ('USP') Monograph for Enoxaparin Sodium 'USP Monograph' . . ., each production batch of generic enoxaparin must be evaluated to determine that about 20% (or between 15%-25%) of its sugar chains include, at their reducing ends, a sugar that includes a 1,6-anhydro ring structure."); *see also* A2514 ¶ 8; A3486-A3489 ¶ 8.

<u>Second</u>, Teva operates under the same federal regulatory scheme as Amphastar, as Momenta acknowledges.  FDA regulations require that Chemi document the use and results of the release tests it performs on Teva's generic enoxaparin in "batch production and control records."  *See* Blue Br. at 14 (citing 21 C.F.R. § 211.188(b)).  These batch production and control records demonstrate that "each significant step in the manufacture, processing, packaging, or holding of the batch was accomplished," and, notably, include "complete data derived from all tests necessary to assure compliance with established specifications and standards." *Id.* (quoting 21 C.F.R. §§ 211.188(b) and 211.194(a)).

<u>Third</u>, Momenta concedes that these batch records must be "retained for at least 1 year after the expiration date of the batch" and must be "readily available

Confidential Material Redacted

for authorized inspection during the retention period at the establishment where the

activities described in such records occurred." *Id.* at 14-15 (quoting §§ 211.180(a)

and 211.180(c)).

---

This is the Building Block Test that Momenta sought to inject into the case
after Teva filed its motion for summary judgment.

██████████████████████████████████

█████████████████████

In its brief opposing Teva's summary judgment motion, Momenta repeated many of the same arguments that it had made before this Court, and that this Court had rejected, in *Momenta I*.  A3427-A3451.  Momenta additionally argued, however, that because the 1,6-Anhydro Release Test was performed abroad by Chemi, Teva was liable for infringing the '886 patent under 35 U.S.C. § 271(g) notwithstanding the § 271(e)(1) safe-harbor.  A3439-A3442.

In its reply brief, Teva addressed Momenta's arguments regarding Section 271(g).  A4755-A4767.  Teva argued that Momenta's reliance on § 271(g) was misplaced because its generic enoxaparin was not in any way "made by" practicing the quality control test accused of infringing the '886 patent.  A4761-A4765.

On May 10, 2013, Momenta sought leave of the District Court to file a surreply to make additional arguments in further opposition to Teva's summary judgment motion.  A4988-A4989.  Teva did not oppose Momenta's motion.  *Id*.  The District Court denied Momenta leave to submit further written argument (A92 at ECF No. 194), but instead gave Momenta the opportunity to present all of its additional arguments regarding Section 271(g) at the July 1, 2013 summary judgment hearing.  Momenta's counsel took full advantage of that opportunity.  A4832-A4839; A4842-4844.

14

On July 19, 2013, the District Court granted Teva's motion for summary judgment of non-infringement on two principal grounds.  A1-A9.  First, the court held that the accused release tests fell within § 271(e)(1)'s safe harbor under *Momenta I*.  A3-A7 (incorporating by reference A4855-A4857).  The District Court rejected Momenta's contention that "even if the testing done to achieve FDA approval is subject to the § 271(e)(1) safe harbor, Teva's sales activity is a separate form of patent infringement under 35 U.S.C. § 271(g)" as an "attenuated interpretation of § 271(g)" that "incorrectly relies on the illogical assertion that practicing a process abroad could somehow constitute an act of infringement even though, due to the protections of the safe harbor provision, that same process would not constitute infringement when practiced within the United States."  A5-A6.

Second, the District Court held that Teva cannot infringe under § 271(g) because "there is no product that is 'made' by the accused tests and sold in the United States."  A7.  In reaching its conclusion, the District Court rejected Momenta's argument that "the testing does result in the product being 'made' because it is conducted as part of the broader 'manufacturing process.'"  *Id*.  The court noted that all the asserted claims require that enoxaparin exist *before* the allegedly infringing quality control release test is performed:  "Without a pre-existing sample of enoxaparin the allegedly infringing testing could not take

15

place." *Id*. Finally, the court concluded that what is actually "made" by the alleged practice of the asserted claims of the '886 patent is "1) a digested sample of enoxaparin and 2) information about that sample, neither of which is subsequently sold by Teva." *Id.*

### E.    After Teva moves for summary judgment, Momenta unsuccessfully tries to accuse a second release test of infringing the '886 patent.

On February 28, 2013 — four weeks after Teva moved for summary judgment and seven months after the scheduling order's deadline for amending contentions and the close of fact discovery[6] — Momenta, without first seeking leave of court, served its Third Amended Infringement Contentions alleging, for the first time, that a second release test, Chemi's "Building Block Test," also infringed the '886 patent. A2740-A2778. In addition to containing an entirely new infringement theory, the Third Amended Infringement Contentions included new factual allegations and re-asserted 22 previously dropped claims. *Id.*; A2730.

To support its new contention that the Building Block Test infringes the '886 patent, Momenta's Third Amended Infringement Contentions relied principally on two documents: ███████████████████████████

---

[6]    Even if one excludes the time during which the case was stayed pending resolution of Momenta's rehearing and *certiorari* petitions in *Momenta I*, Momenta still served its new contentions two months after both the court-ordered deadline for doing so and the close of fact discovery. A592; A2297-A2299; A2345-A2347; A2417; A2460.

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████    Teva produced both

those documents to Momenta on June 20, 2011, nearly two years before Momenta

first alleged that the Building Block Test infringed the '886 patent.  A2742.

Momenta was fully aware these documents existed and understood their

significance.  Not only were they among the first documents produced by Teva at

the very beginning of fact discovery, *id.*, but Momenta actually *cited* both of them

in its September 22, 2011 First Amended Infringement Contentions (A2797) and

July 12, 2012 Second Amended Infringement Contentions (A2780).

On March 18, 2013, Teva moved to strike Momenta's Third Amended

Contentions arguing that Momenta's attempt to assert new contentions regarding

the Building Block Test was untimely and futile.  A2720-A2722; A2730-A2738.

On July 19, 2013, the District Court granted Teva's motion to strike and denied

Momenta's motion for leave to serve its Third Amended Infringement Contention.

A8-A9 (incorporating by reference A4859-A4863).  The District Court reasoned

that Momenta's contention regarding the Building Block Test was futile because

even if everything Momenta contended were true, performing that test was protected by § 271(e)(1).  A4860-A4861.

## SUMMARY OF ARGUMENT

The judgment should be affirmed, first, because Teva's generic enoxaparin product is not "made by" the method claimed in the '886 patent, and therefore the sale of that product in the U.S. cannot violate 35 U.S.C. § 271(g).  This follows from the plain language of the claims-in-suit, all of which describe a method of characterizing enoxaparin that has already been "made."  It follows as well from the decisions of this Court which make it clear that § 271(g) only applies to methods of synthesizing either the product itself or an intermediate material used in synthesizing the product.  The method of the '886 patent does neither, but merely generates information about an enoxaparin sample.  As a matter of law, § 271(g) is inapplicable.

Even if Teva's product were "made by" the method of the '886 patent, § 271(g) would not apply because the use of that method falls within the safe harbor of 35 U.S.C. § 271(e)(1).  Momenta is collaterally estopped from challenging the ruling in *Momenta I* that § 271(e)(1) insulates from liability the use of the '886 patent to generate information that federal pharmaceutical law requires Teva to submit on demand to the FDA, and that ruling constitutes binding precedent.

18

Moreover, this Court should follow *Momenta I* because it correctly interpreted § 271(e)(1). The use of a patent to generate information that federal pharmaceutical law requires to be maintained and submitted on demand to the FDA is "reasonably related to the development and submission of information" under such law. In addition, under this Court's decisions, the use of the *information generated* by the use of the patented method for other purposes is consistent with the use of the patent itself "solely" for uses "reasonably related" to the development and submission of information under federal law.

Momenta's suggestion that *Momenta I* effectively insulates a "wide swath of infringing commercial conduct" from liability is dramatically overstated. The patent-in-suit is specifically directed to a method of generating information that is required to be submitted on demand to the FDA. That the use of such a method has a "reasonable relationship" to the submission of information to the FDA does not compel the conclusion that patents directed to drug products themselves, or to methods of manufacturing or using such drugs (much less patents covering laboratory equipment with many uses) also have such a "reasonable relationship."

The District Court acted within its discretion by denying Momenta the opportunity to submit a surreply brief in response to Teva's argument that its product will not be "made by" the method claimed in the '886 patent. Teva made that argument in response to an argument raised for the first time in Momenta's

opposition to Teva's summary judgment motion and under such circumstances, there is no right to a surreply.  Moreover, the District Court permitted Momenta to make all of its "surreply" arguments at the hearing on Teva's motion. Accordingly, any error by the District Court was harmless.

Finally, the District Court did not abuse its discretion in denying Momenta leave to amend its infringement contentions to accuse a second quality testing procedure.  The District Court correctly recognized that the amendment would be futile because the amended claims suffered from exactly the same legal infirmities as the claims on which the court granted summary judgment.  Moreover, even though Momenta received the documents cited to support the amended contentions early in the case, Momenta did not seek leave to amend until long after all relevant procedural deadlines had passed.  Momenta's manifest lack of diligence is an independent reason to uphold the District Court's denial of leave to amend.

## ARGUMENT

### I.    Standard of Review

This Court reviews orders granting summary judgment and questions of statutory interpretation *de novo.  See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1354-55 (Fed. Cir. 2003).  District Court orders denying motions to amend pleadings or contentions are reviewed for an abuse of discretion.  *See Speedtrack, Inc. v. Endeca Techs., Inc.*, 524 F. App'x 651, 659 (Fed. Cir. 2013);

*O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 154 (1st Cir. 2004).  District

Court case management orders are governed by regional circuit law, and the First

Circuit likewise reviews them for abuse of discretion.  *See Acumed LLC v. Stryker*

*Corp.*, 551 F.3d 1323, 1331 (Fed. Cir. 2008); *Thibeault v. Square D Co.*, 960 F.2d

239, 242-43 (1st Cir. 1992).

II.  **Teva's proposed generic enoxaparin product is not "made by" the method claimed in the '886 patent and therefore its importation will not infringe under 35 U.S.C. § 271(g).**

Teva's enoxaparin product will be manufactured overseas.  Thus, even if the

manufacturer employs the method claimed in the '886 patent,[7] the use of the

patented method will not infringe that patent under 35 U.S.C. § 271(a) because

U.S. patents apply only to conduct within the United States.  *See* 35 U.S.C.

§ 154(a)(1); *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454-55 (2007) ("The

presumption that United States law governs domestically but does not rule the

world applies with particular force in patent law. The traditional understanding that

our patent law 'operate[s] only domestically and do[es] not extend to foreign

activities' is embedded in the Patent Act itself, which provides that a patent confers

exclusive rights in an invention within the United States." (citations omitted)).

---

[7]    There has been no determination either that Chemi's quality testing will practice all of the limitations of the '886 patent — Teva denies that it would — or that the '886 patent would survive Teva's invalidity and unenforceability challenges, which remain unresolved.

Accordingly, Momenta relies on 35 U.S.C. § 271(g) which makes it an act of infringement to import or sell in the United States "a product which is made by a process patented in the United States."

The District Court correctly rejected Momenta's § 271(g) claim because Teva's enoxaparin product is not "made by" the process claimed in the '886 patent. That Teva's product is not "made by" the claimed process is apparent from the language of the claims themselves. All of the claims-in-suit are directed to a "method for analyzing an enoxaparin sample"[8] to generate specific information about that sample. Thus, for the claimed method to be practiced, enoxaparin must already be "made."

Momenta argues that the '886 patent contemplates that in some applications of the claimed analytical method, the enoxaparin batches from which samples are drawn and analyzed by the method are meant to undergo "further processing" and that such processing may be informed by the information generated by practicing the claimed method. Blue Br. at 60. But that does not mean that those batches (before or after the samples are tested) are "made" by the claimed method. The batches are "made" before samples taken from them are tested. No further

---

[8]    The District Court construed "an enoxaparin sample" to mean "an enoxaparin composition which is derived from and representative of a particular batch of enoxaparin." A2345.

22

"processing" of the batch from which the sample was drawn — principally packaging — involves any use of the claimed method. The method of the '886 patent does not cause any physical transformation or alteration of any drug product that will be sold in the U.S.[9] It simply generates information about a sample of the drug. A7.

This Court has ruled that a product is *not* "made by" a patented method if that method merely generates information that is used by the manufacturer in the manufacturing process. In *Bayer AG v. Housey Pharm., Inc.*, 340 F.3d 1367 (Fed. Cir. 2003), the patent claimed a method for determining whether a substance inhibited or activated a particular protein. The result of practicing the claimed method was information concerning the tested substance. The patentee sued under § 271(g), alleging that the accused infringer used information generated by the patented method in making a drug product sold in the U.S. and arguing the product was therefore "made by" the patented method.

This Court disagreed. In language directly applicable to this case, the Court said:

---

[9]    The actual samples of enoxaparin that are analyzed by the claimed method are so transformed by the testing method that they are no longer "enoxaparin" and cannot be sold as enoxaparin in the U.S. The sample tested must be "exhaustively digested" and "separated" into components. A72; A3505-A3506.

> [For § 271(g) to apply,] the [patented] process must be
> used directly in the manufacture of the product, and not
> merely as a predicate process to identify the product to be
> manufactured. *A drug product, the characteristics of
> which were studied using the claimed research
> processes, therefore, is not a product "made by" those
> claimed processes.*"

*Id.* at 1378 (emphasis added); *see also NTP, Inc. v. Research in Motion, Ltd.*, 418
F.3d 1282, 1323 (Fed. Cir. 2013) ("the 'transmission of information,' like the
'production of information,' does not entail the manufacturing of a physical
product" and so § 271(g) does not apply); *Phillip M. Adams & Assocs., LLC v. Dell
Computer Corp.*, 519 F. App'x 998, 1005 (Fed. Cir. 2013) (computer components
were not "made by" patented certification testing method; patented method
"constituted mere 'production of information' that [components complied] with
certification standards"; "mere 'production of information is not covered' by
§ 271(g)").

Like the patentees in these cases, Momenta alleges that Chemi uses the
claimed method to ascertain certain characteristics of a sample of an enoxaparin
batch.  The claimed method is thus simply a "predicate process to identify the
product" as enoxaparin with particular characteristics.  As a matter of law, the
enoxaparin product that Teva seeks to sell in the U.S. is not "made by" that
process.

Momenta's reliance on *Bio-Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996), is misplaced for the same reasons this Court distinguished that case in *Bayer*.  In *Bio-Technology*, the patent claimed a method for making a plasmid capable of expressing a particular polypeptide.  The patentee alleged that the defendant used the patented method overseas to make a plasmid that was used in turn to make a drug product sold in the U.S.  Relying on the legislative history of § 271(g) which described precisely that situation, the Court concluded that the drug product was "made by" the patented process.  *Id.* at 1561.  Practicing the claimed method was a step in the physical synthesis of the drug product.

This Court distinguished *Bio-Technology* in *Bayer* on the ground that the patented process at issue in *Bayer* was "*not* used in the actual synthesis of the drug product."  340 F.3d at 1377 (emphasis added).  The same is true here.  There is no contention that the method claimed in the '886 patent is used to synthesize enoxaparin.  As a matter of law, "'processes of identification and generation of data are not steps in the manufacture of a final drug product.'"  *Id.* (quoting *Bayer AG v. Housey Pharm., Inc.*, 169 F. Supp. 2d 328, 331 (D. Del. 2001)).  Rather, a product is "made by" a patented method only if practicing that method directly acts to physically alter or transform matter into the product or into an intermediate material that is subsequently transformed into the product (as in *Bio-Technology*).

25

*See id*. at 1377-78; *see generally* 35 U.S.C. § 271(g)(2) (A product is not "made by" a patented process if "it is materially changed by subsequent processes.") Momenta's claimed method manifestly does not do this.

Momenta attempts to blur the clear line drawn between methods of synthesis and methods of obtaining information by characterizing Chemi's alleged use of the claimed method as an interim "quality control" step in a manufacturing process. Blue Br. at 59. But similar contentions were made and rejected in *Bayer* and *Philip M. Adams*. The patentee in *Bayer* alleged that Bayer "produced drugs using information created by the patented processes." 340 F.3d at 1377. In *Philip M. Adams* the patentee argued that the claimed certification testing was "integrated" into a manufacturing process. This Court rejected these arguments because the testing method was not used to "make" the tested components even if the information generated by the methods informed the manufacturing process. 519 F. App'x at 1005. Momenta cites no case that finds that a product is "made by" a method of obtaining information about the product at any stage of its synthesis, even if the information is used during the manufacturing process for quality control or some other purpose.[10]

---

[10]    Momenta cites FDA regulations governing the manufacturing, processing, packaging and holding of drugs to support the contention that "quality control" is part of manufacturing. Blue Br. at 59. But the regulated activities encompass much more than the actual synthesis of drugs. Indeed, the regulations distinguish

(*continued next page*)

The claimed method is not used in this case to "make" enoxaparin; it is used to ascertain whether Chemi's distinct and unpatented method for making enoxaparin succeeded in making enoxaparin with particular characteristics required by the FDA. Because Teva's generic enoxaparin product is not "made by" the method claimed in Momenta's patent, there can be no infringement under § 271(g). For that reason alone, the judgment in favor of Teva must be affirmed.

III. **The importation and sale of Teva's proposed generic enoxaparin product will not constitute infringement under § 271(g) because any use of Momenta's claimed method falls within the safe harbor of 35 U.S.C. § 271(e)(1).**

Even if Teva's proposed generic enoxaparin product were somehow "made by" the method claimed in the '886 patent, its importation would not constitute an infringement under § 271(g) because Chemi's alleged use of that method did not infringe that patent. As this Court ruled in *Momenta I*, the use of the method claimed in the '886 patent to generate information that federal law requires Teva to maintain and submit to FDA upon demand falls within the safe harbor established

---

between quality control and manufacturing. 21 C.F.R. § 211.110(a) refers to "*control* procedures" that "validate the performance of those *manufacturing processes* that may be responsible for causing variability in the characteristics of in-process material and the drug product." *Id.* (emphasis added). The "control procedure" itself is thus not a manufacturing process under the regulations. Thus, the very regulations on which Momenta relies draw the same distinction that this Court drew in *Bayer* between methods of synthesis and methods of deriving information.

by 35 U.S.C. § 271(e)(1).  The District Court correctly concluded that Momenta's

infringement action must fail because of § 271(e)(1).

Momenta advances two arguments in support of its contention that the

District Court erred.  Momenta first suggests that even if § 271(e)(1) applied to the

use of the claimed method in characterizing samples of enoxaparin made by

Chemi, that statute does not apply to the subsequent sale of the batches of

enoxaparin from which the tested samples were taken.  Alternatively, Momenta

contends that *Momenta I* is wrongly decided and not binding in this case.  Neither

argument is persuasive.

### A. Because § 271(g) only applies if practicing the claimed method would infringe a valid process patent, application of § 271(e)(1) to Chemi's alleged use of Momenta's claimed method precludes any liability under § 271(g).

Momenta argues that even if the overseas use of the '886 patent's analytical

method to characterize samples of enoxaparin is "reasonably related to the

development and submission of information" under a federal law regulating

pharmaceuticals, the same cannot be said of Teva's subsequent sale in the U.S. of

the enoxaparin from which the tested samples were drawn.  Blue Br. at 52-56.

Positing that each alleged act of infringement must be analyzed separately,

Momenta insists that the elements of § 271(e)(1) must be separately applied to the

sale of those products and argues that the sale of a commercial product is not

"reasonably related" to the information requirements of federal law.  *Id.*

28

Momenta overlooks that it does not matter whether the sale of enoxaparin in the U.S. falls within § 271(e)(1)'s safe harbor unless that sale would otherwise constitute patent infringement. The only patent asserted against Teva in this case is the '886 patent, a method patent, and Momenta's infringement claim is based solely on § 271(g). Accordingly, the sale of Teva's generic enoxaparin product is not actionable as patent infringement unless the manufacture of that product infringes the '886 patent. If § 271(e)(1) applies to Chemi's alleged use of the '886 patent, then Teva's sale of the enoxaparin from which tested samples were drawn will not infringe under § 271(g), even under the dubious assumption that the enoxaparin is "made by" a process that merely identifies certain characteristics of that substance but plays no part in its actual synthesis. If Teva's enoxaparin sales would not otherwise infringe any patent, then there is no need to consider whether the sales themselves would independently qualify for § 271(e)(1)'s safe harbor.

This logical conclusion is exactly what Congress had in mind when it enacted § 271(g). The legislative history of § 271(g) could not have expressed the understanding of both House and Senate in this regard more clearly: "[T]he Committee does not intend that it shall be an act of infringement to import a product which is made by a process patented in the United States 'solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use or sale of drugs.'" S. Rep. 100-

83, 100th Cong., 1st Sess., at 48 (June 23, 1987); *see also* H.R. Rep. 100-60, 100th Cong., 1st Sess., at 18 (Apr. 22, 1987) (same).  In *Amgen, Inc. v. ITC*, 565 F.3d 846 (Fed. Cir. 2009), this Court quoted this language, accepted that it reflected the applicability of § 271(e)(1) to claims under § 271(g), and even extended the defense provided by § 271(e)(1) to claims under § 337 of the Tariff Act.  Momenta disregards this completely.

Imposition of liability under § 271(g) without proof of patent infringement would make no sense.  Section 271(g) is a remedy for the infringement of process patents.  As this Court has recognized, a principal purpose of § 271(g) was to give the owners of process patents protection against those who would move infringing manufacturing operations overseas to make products for the U.S. market.  *See Bayer*, 340 F.3d at 1375-76.  Congress plainly did not intend to allow patentees to prevent the sale of products where neither the products nor the method of manufacturing them infringed *any* patent owned by the patentee.  On the contrary, Congress expressed its understanding that "the patent owner [in a § 271(g) case] *always* has the ultimate burden of producing evidence adequate to persuade the court that *infringement* exists."  H.R. Rep. 100-60, 100th Cong., 1st Sess., at 57 (1987) (emphasis added).  There was no reason either to give owners of method patents remedies against *non-infringing* uses of patented methods or to deny those accused of practicing patented methods overseas the benefit of the same patent law

30

defenses available to those practicing those methods domestically.  Such a

dramatic expansion of patent rights would, for example, allow patentees to invoke

§ 271(g) to enforce invalid or unenforceable method patents, as well as method

patents used in a manner covered by § 271(e)(1)'s safe harbor.  Accordingly, this

Court has repeatedly rejected the imposition of liability under § 271(g) where the

alleged use of the patented process would not infringe the asserted patent.  *See*

*Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359-60 (Fed. Cir. 2007);

*Mycogen Plant Science, Inc. v. Monsanto Co.*, 252 F.3d 1306, 1318 (Fed. Cir.

2001), *vacated on other grounds*, 535 U.S. 1109 (2002); *Novo Nordisk of N. Am. v.*

*Genentech, Inc.*, 77 F.3d 1364, 1367-71 (Fed. Cir. 1996).

In rejecting Momenta's contrary argument, the District Court noted that

Momenta would give greater rights against overseas use of method patents than is

available against domestic use.  A5-A7.  Momenta quarrels with this ruling,

arguing that § 271(g) is not limited to the importation or sale of products "made

by" patented processes overseas, but gives owners of process patents rights against

goods "made by" their patented processes wherever made.  Blue Br. at 56-61.  This

argument fails for two reasons.

Initially, Momenta's argument about § 271(g)'s domestic applicability is

dubious at best, as Amphastar as appellee in the companion appeal cogently

demonstrates in its brief.  But even if Momenta were correct that § 271(g) applies

regardless of where a product is made, Momenta misses the point of the District

Court's observation.  The District Court recognized that a defendant accused of

infringing a method patent domestically could raise any available patent law

defense, and concluded that a person accused of importing products made by the

same patented method overseas would be able to raise the same defenses.  A6-A7.

Its reasoning in this regard makes perfect sense, and Momenta does not question it.

The tacit assumption on which Momenta's argument logically turns is that

§ 271(g) provides a remedy against products made by a patented process

(domestically or overseas) *even if the use of the patented process would not*

*constitute infringement of the process patent*.  That assumption does not make

sense.  As demonstrated above, both the decisions of this Court and the legislative

history of § 271(g) show that assumption to be completely wrong.[11]

---

[11]    It is not significant that Congress did not expressly provide in the statute
itself that § 271(g)'s remedies are available only if the patentee demonstrates
infringement of the process patent.  The same section of the Patent Code provides
that it is an "act of infringement" to file an abbreviated new drug application with a
certification that the proposed generic drug does not infringe a patent listed by the
patentee as covering the reference drug.  35 U.S.C. § 271(e)(2).  But even though
the mere act of filing such an ANDA is deemed an "act of infringement," there has
never been any doubt that to obtain relief under § 271(e)(2), the patentee must
prove that the proposed generic drug would actually infringe the listed patent.
*E.g.*, *Ferring B.V. v. Watson Labs., Inc.–Florida*, No. 14-1416, 2014 WL 4116461,
at *7 (Fed. Cir. Aug. 22, 2014).  Similarly, as the decisions of this Court and
§ 271(g)'s legislative history make clear, there is no doubt that a patentee invoking
§ 271(g) must prove that the alleged use of the patented process to "make" a
product would infringe the process patent.

If, as the District Court found, § 271(e)(1) insulates Teva/Chemi's alleged use of the process patented in the '886 patent to generate data that must be made available to the FDA on demand, then there can be no liability under § 271(g).

**B.    The use of a patented method specifically directed to generating information that must be submitted to the FDA upon demand is protected by 35 U.S.C. § 271(e)(1).**

**1.    There is no occasion for the panel in this case to reconsider the ruling in *Momenta I*.**

Momenta's principal argument is that the alleged use of the '886 patent's method to generate information concerning samples of enoxaparin to confirm compliance with FDA's requirements — information that Teva must make available on demand to the FDA — is not encompassed within § 271(e)(1)'s safe harbor. Blue Br. at 32-52. The first, and fatal, obstacle to this argument is that this Court squarely rejected it as a matter of law in *Momenta I*. Momenta is bound by this ruling, but even if the doctrine of issue preclusion did not technically apply, *Momenta I* is a legal precedent that this Court is bound to follow in other cases unless and until it is overruled *en banc*. This Court need not, and should not, consider Momenta's arguments that *Momenta I* was wrongly decided.

**a.    Momenta is collaterally estopped from challenging the legal ruling in *Momenta I*.**

As a matter of law, Momenta is collaterally estopped from challenging the ruling in *Momenta I* that the use of the '886 patent as alleged in the complaint falls within the safe harbor of § 271(e)(1). Collateral estoppel, or issue preclusion as

33

the doctrine is now more commonly called, bars a party from relitigating an issue finally resolved in earlier litigation after a fair opportunity to litigate the issue. *See Abbvie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1295 (Fed. Cir. 2014) (quoting *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007)); RESTATEMENT (SECOND) OF JUDGMENTS ("Restatement") § 27. The doctrine applies equally to findings of fact and conclusions of law. *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 480 (Fed. Cir. 1991) ("[O]nce a legal or factual issue has been settled by the court after a trial in which it was fully and fairly litigated that *issue* should enjoy repose." (emphasis in original)); Restatement § 27.

In *Momenta I*, this Court ruled that the use of the '886 patent's method to generate information that must be maintained and submitted to the FDA upon demand falls within the scope of § 271(e)(1). The identical issue involving the same patent is presented in this case and Momenta makes no claim that it did not have a fair opportunity to litigate the issue in *Momenta I*.

Momenta seeks to avoid the preclusive effect of the ruling in *Momenta I* on the ground that the Court in *Momenta I* was reviewing an order granting a preliminary injunction. Momenta insists that all findings of fact and conclusions of law at the preliminary injunction stage are "subject to change," and do not bind "subsequent panels." Blue Br. at 33. Momenta cites *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1346 (Fed. Cir. 2004), which, in turn, cites *University of*

34

*Texas v. Camenisch*, 451 U.S. 390 (1981), and *International Communication Materials, Inc. v. Ricoh Co.*, 108 F.3d 316 (Fed. Cir. 1997).

Momenta's reliance on these cases is misplaced in its case against Teva. None of the cases involved *collateral* estoppel at all, *i.e.* the binding effect of a finding or ruling in one case in a separate *collateral* case. In all three, the court addressed whether a ruling made at the preliminary injunction stage precluded the court from revisiting the subject of the ruling at a later stage *of the same case.* The Supreme Court in *Camenisch* held that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding *on the trial on the merits.*" 451 U.S. at 395 (emphasis added). Similarly in *Glaxo* even though the Court had affirmed a preliminary injunction against the defendant, the Court revisited the arguments raised again by the defendant (and again rejected them) in an appeal from the final judgment *in the same case.* 376 F.3d at 1346-47. And in *Ricoh*, the Court affirmed a preliminary injunction noting, in dictum, that because the district court's claim construction was avowedly tentative, its affirmance of the injunction left the trial judge free to "complete the picture" at trial. 108 F.3d at 318-19.

Momenta cites *no* cases that discuss the binding effect of a ruling made in connection with a preliminary injunction in a separate litigation. But that is the situation in this case. In Momenta's separate case against Teva, principles of issue

preclusion do apply as to the issues resolved in *Momenta I*.  And contrary to
Momenta's argument, courts have precluded a party from collaterally attacking
rulings made in preliminary injunction decisions in earlier cases, where, as here,
the resolution of an issue was not avowedly tentative and the losing party had a full
and fair opportunity to make its arguments.  The litigation over Miller Brewing
Co.'s efforts to secure trademark protection for "LITE" as applied to beer
illustrates the point.

In *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir.
1977), the Seventh Circuit reversed a preliminary injunction that Miller obtained
against a brewer that used "LITE" in connection with its low calorie beer, ruling
that the word "light" and its phonetic equivalents were generic terms as applied to
beer and could not be trademarked.  Later, in another suit against a different
brewer, the Seventh Circuit ruled that Miller was collaterally estopped by the
ruling in *Heileman* from challenging the ruling that "LITE" was generic and could
not be trademarked.  *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990
(7th Cir. 1979).  The First Circuit applied the doctrine of issue preclusion based on
*Heileman* and *Schlitz* when Miller later sued a Rhode Island brewer.  *Miller
Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5 (1st Cir. 1981).

These cases are directly on point in that they concern the preclusive effect of
an appellate decision (*Heileman* and *Momenta I*) that vacated a preliminary

36

injunction based on a ruling of law that created insuperable obstacles to the

maintenance of the plaintiff's claim. The ruling in *Falstaff* is particularly pertinent

because this Court looks to the law of the regional circuits governing "general

collateral estoppel principles, such as finality of judgment." *Abbott Labs. v. Andrx

Pharm., Inc.*, 473 F.3d 1196, 1202 & n.4 (Fed. Cir. 2007). First Circuit law

therefore governs whether this Court's ruling in *Momenta I* collaterally estops

Momenta in this case.

This Court discussed at length these "LITE" cases, and the issue preclusion

principles they reflect, in *Abbott*, a case that Momenta remarkably does not even

cite, much less discuss. In *Abbott*, this Court recognized (as did the courts in the

LITE cases) that to be "final" for collateral estoppel purposes, the decision "need

not be final in the sense of 28 U.S.C. § 1291." *Id.* at 1204. The Court quoted

Judge Friendly's often repeated observation that for collateral estoppel purposes

"[f]inality . . . may mean little more than that the litigation of a particular issue has

reached such a stage that a court sees no really good reason for permitting it to be

litigated again." *Id.* (*quoting Miller*, 605 F.2d at 996 (*quoting Lummus Co. v.

Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (Friendly, J.)))

(internal quotations omitted). This Court identified the considerations that bear on

whether a decision is "final": "whether the parties were fully heard, the court

supported its decision with a reasoned opinion, and the decision was subject to

37

appeal," and whether the decision was "avowedly tentative." *Abbott*, 473 F.3d at 1204.[12]

There can be no dispute that *Momenta I* meets all of these criteria. Momenta makes no argument that it was not fairly and fully heard by this Court in *Momenta I* on the legal issue decided in that appeal. It briefed the scope of § 271(e)(1) both in the District Court and in this Court. This Court discussed at length the proper construction of that statute, responding to both Momenta's arguments and then-Chief Judge Rader's dissent. And there was nothing "avowedly tentative" about

---

[12]     Although this Court's discussion was based on its analysis of Seventh Circuit law, it is reasonable to infer (absent authority to the contrary) that a similar analysis would be applied in the First Circuit because that Court in *Falstaff* relied on the Seventh Circuit's analysis in the LITE cases.

Indeed, there is reason to think that the First Circuit may give *greater* preclusive effect to non-tentative findings made in preliminary injunction rulings than the Seventh Circuit. In *Walsh v. International Longshoremen's Association*, 630 F.2d 864 (1st Cir. 1980), the First Circuit gave preclusive effect to a finding that there was no reasonable cause to believe that a violation of the NLRA had occurred. *Id.* at 867-69. That finding had been made in an order denying preliminary injunctive relief in the district court in a separate proceeding. *Id.* The First Circuit reasoned that on that narrow issue, the NLRB had a fair opportunity to litigate and that the policies underlying the collateral estoppel doctrine fully applied. *Id.* As this Court inferred in *Abbott*, the Seventh Circuit may not give preclusive effect to the analogous determination that there is a likelihood of success made in connection with a preliminary injunction ruling. 476 F.3d at 1206.

In any event, these concerns are not present here. This Court in *Momenta I* did not vacate the preliminary injunction based on a tentative conclusion that Momenta was unlikely to succeed, but rather on a final legal ruling that § 271(e)(1) applied as a matter of law to Amphastar's alleged use of the patented method.

the Court's decision. (That one member of the panel disagreed with the majority does not make the opinion for the Court "tentative," however fervent that dissent.)[13] There has been no subsequent change in the law, either statutory or decisional, that would undermine the ruling in *Momenta I* or provide any reason not to hold Momenta bound by that ruling.[14]

Momenta argues *Momenta I* is not binding because this Court accepted as true that Amphastar was required to use an allegedly infringing test in the USP monograph on enoxaparin to comply with FDA requirements. Blue Br. at 35-36

---

[13]    These factors were *not* present in *Abbott* itself. The decisions on which Andrx predicated its collateral estoppel argument were "avowedly tentative." The district court findings on which Andrx relied were couched in terms of "probabilities, not certainties." 473 F.3d at 1206. Although this Court had affirmed one of those district court decisions, the Court explicitly underscored the tentative character of its decision affirming the district court. *Id.* at 1206-07. The Court's opinion in *Momenta I* expresses no comparable reservations. Indeed, the Court suggested that its ruling was likely dispositive on the merits and invited the District Court to consider resolving the case on summary judgment. 686 F.3d at 1361.

[14]    Similar considerations support the argument that this Court's decision in *Momenta I* established the "law of the case" in *Momenta v. Amphastar* and that there is no occasion to reconsider that law in Momenta's appeal from the final judgment in that case. Absent "exceptional circumstances," not present here, both this Court and the First Circuit deem the legal rulings established on an appeal from the grant or denial of a preliminary injunction to constitute the "law of the case" that governs in subsequent proceedings. *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1301-02 (Fed. Cir. 2012) (holding that "a court generally adheres to a decision in a prior appeal in the case" absent "exceptional circumstances"); *Naser Jewelers, Inc. v. City of Concord*, 538 F.3d 17, 20 (1st Cir. 2008).

(citing 668 F.3d at 1361).  Momenta insists that there are other, non-infringing

tests that would allow compliance.  But, as Momenta also acknowledges, Blue Br.

at 36, this Court in *Momenta I* made it very clear that this assumption played no

part in its interpretation of § 271(e)(1), and that as a matter of law § 271(e)(1)

"does not mandate the use of a noninfringing alternative when one exists."  668

F.3d at 1359.

Momenta is thus forced to argue that it should not be bound by *Momenta I*

because it has refined its position to include points it failed to make in *Momenta I*.

*See* Blue Br. at 36-37.  There are few losing litigants who could not make the same

argument.  But Momenta cites no authority that such considerations play any part

in an issue preclusion analysis, and Teva is aware of no such authority.  Momenta

conceivably may raise its "new" arguments in seeking rehearing *en banc* in the

*Amphastar* appeal, but Momenta has advanced no plausible reason why the

doctrine of collateral estoppel should not bar its infringement claim against Teva.

> **b.    The panel is bound to accept the legal rulings of**
> ***Momenta I* unless and until they are overturned by**
> **the Supreme Court or this Court en banc.**

Even if Momenta were not collaterally estopped from challenging the

interpretation of § 271(e)(1) in *Momenta I*, panels of this Court are bound by the

legal rulings of panels in earlier cases unless and until their rulings are overturned

by the Supreme Court or by this Court sitting en banc.  *E.g.*, *Tex. Am. Oil Corp. v.*

*U.S. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) ("This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other controlling authority such as intervening statutory change or Supreme Court decision."). Momenta does not quarrel with this proposition. Indeed, it invokes it when it argues that this case is governed by *Classen Immunotherapies, Inc. v. Biogen Idec*, 659 F.3d 1057 (Fed. Cir. 2011), instead of *Momenta I*.[15]

Momenta plainly disagrees with *Momenta I*, but its arguments that that decision misinterpreted § 271(e)(1) are not properly directed to a panel of this Court in a distinct case. If this Court applies the interpretation of § 271(e)(1) that it gave in *Momenta I* (as it must) and, (if it reaches the issue) concludes that § 271(e)(1) applies to Teva's alleged used of the method claimed in the '886 patent (as it should), then Momenta is free to petition the Court for rehearing *en banc* and, if rehearing is denied, it can petition the Supreme Court for review. Momenta did both (unsuccessfully) after *Momenta I*. We note, however, that in this case there is no need to reach the § 271(e)(1) issue because the manifest inapplicability of

---

[15]    Momenta's argument in this regard requires it to show that *Momenta I* is inconsistent with *Classen*. But the Court in *Momenta I* acknowledged that *Classen* was binding precedent, distinguished the circumstances in *Momenta I* from those in *Classen*, and ruled that under the circumstances in *Momenta I* § 271(e)(1) did apply. 686 F.3d at 1357-58. Both decisions now constitute binding precedent and on *this* appeal *Momenta I*, not *Classen*, is the controlling precedent, because *Momenta I* involves the identical patent, the same regulatory provisions and the same alleged use of the method claimed in the patent.

§ 271(g) provides a reason to affirm the summary judgment for Teva without regard to the proper meaning of § 271(e)(1).

**2.    The alleged use of the claimed method falls within § 271(e)(1)'s safe harbor because it is employed solely for uses reasonably related to the development and submission of information under federal law governing pharmaceuticals.**

If this Court considers Momenta's arguments that *Momenta I* was wrongly decided, it should reject them on the merits.  Momenta advances three reasons why the Court should not apply § 271(e)(1) to Teva's alleged use of the process claimed in the '886 patent.  First, Momenta argues that because the law (in its view) requires "maintenance" but not "submission" of the information generated by the alleged use of the patent, that alleged use is not "reasonably related" to the "submission" of information to FDA.  Second, Momenta contends that Teva's alleged use of the process is not "solely" for uses reasonably related to the submission of information to FDA because Teva allegedly uses the information generated by the process in the production of its commercial product.  Third, Momenta makes a "floodgates" argument that the interpretation of § 271(e)(1) in *Momenta I* would "immunize a wide swath of infringing commercial conduct." All three arguments are meritless.

a.   **Because the information generated by the alleged use of the patented method must be maintained for submission to FDA on demand, it is "reasonably related" to the submission of information to FDA under federal law.**

Momenta seeks to draw a hard distinction between information that must be "submitted" to FDA and information that federal law merely requires be "maintained." In its view, § 271(e)(1) only applies to the use of patented methods to generate information that must be "submitted."

The first problem Momenta faces is that the law is clear that information need not be actually "submitted" to the government for § 271(e)(1) to apply. In *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193 (2005), the Supreme Court ruled that uses of patented inventions to generate information fall within the safe harbor so long as the user had "a reasonable basis for believing" that the information generated by the use of the invention "would be appropriate to include in a submission to the FDA," *id.* at 207, even if that information is "not ultimately the subject of an FDA submission." *Id.* at 206; *see also Momenta I*, 686 F.3d at 1357. Accordingly, the suggestion that § 271(e)(1) applies only for information that is required to be submitted is plainly wrong.

Moreover, Momenta ignores the reason *why* federal law requires Teva to "maintain" the information derived from its alleged use of the '886 patent. Under FDA regulations, the information required to be maintained:

43

> [s]hall be readily available for authorized inspection
> during the retention period at the establishment where the
> activities described in such records occurred. These
> records or copies thereof shall be subject to photocopying
> or other means of reproduction as part of such inspection.

21 C.F.R. § 211.180(c). In other words, the maintained records must be *submitted* on demand to FDA inspectors.

Momenta attempts to draw a further distinction between sending information directly to the FDA in Maryland and making it available to FDA inspectors at the manufacturing facility, apparently on the assumption that the latter is not really a "submission." Blue Br. at 41-43. But one searches in vain through the statute and its legislative history for any basis for drawing a distinction between submissions in Washington and submissions at the manufacturing site. Fetching quality control records and placing them before FDA inspectors during a site visit as they consider whether enforcement action is warranted satisfies every definition of "submission" that Momenta quotes. *See* Blue Br. at 40-41.

Moreover, the language of § 271(e)(1) broadly encompasses uses of a patent that are "reasonably related" to the development and submission of information under federal pharmaceutical laws. The Supreme Court in *Merck* emphasized the breadth of the statutory safe harbor as covering "all uses of patented inventions that are reasonably related to the development and submission of *any* information under the FDCA." 545 U.S. at 202. It is not limited to the development of information

44

relevant to an ANDA filing. *Id.* at 206. The Court added: "There is simply no room in the statute for excluding certain information from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included." *Id.* at 202.

And while this Court in *Classen* ruled that information that is routinely and *voluntarily* submitted to the FDA long after marketing approval falls outside the scope of § 271(e)(1), the information generated by the alleged use of the patent in this case is quite different. As the Court noted in *Momenta I*, information confirming that the product satisfies regulatory requirements *must* be maintained and submitted on demand to the FDA as a condition to the maintenance of FDA approval. "Failure to comply with these requirements could result in suspension or revocation of [Teva's] ANDA approval to market" enoxaparin. *See* 686 F.3d at 1358. This Court in *Momenta I* correctly recognized that information that is required to be generated to be submitted to FDA upon demand in order to maintain FDA approval for a drug falls squarely within in the safe harbor of § 271(e)(1).

> **b.  Teva's alleged practice of the method claimed by the '886 patent was "solely" for a use reasonably related to the development and submission of information under federal law, regardless of whether the information developed was used for additional purposes.**

Momenta contends that alleged use of the '886 patent was not "solely" for a use reasonably related to the development and submission of information under

federal law because Chemi allegedly used the information generated by the use of the patented process "for the commercial manufacture of a product for sale." Blue Br. at 48. But this Court has repeatedly distinguished between the use of a patent and the subsequent use of the information generated by the use of the patent, and ruled that the use of that information for multiple purposes does not make § 271(e)(1) inapplicable.

For example, in *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997), the patentee alleged the use of its patented process not only to generate information "consistent with the collection of data necessary for filing an application with the" FDA, but also for marketing and other purposes. *Id.* at 1027. Indeed, the patentee alleged that the "actual purpose" of conducting the tests was to produce information to support these other goals. *Id.* This Court nevertheless concluded that § 271(e)(1) applied. Judge Rader wrote that § 271(e)(1) "does not look to the underlying purposes or attendant consequences of the activity." *Id.* at 1030. All that matters is that the use *of the patented invention* be "reasonably related" to the development and submission of information under federal pharmaceuticals law. If it is, it does not matter if the resulting information is used for other purposes.

The *Abtox* Court relied on *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520 (Fed. Cir. 1992), where the patentee alleged that the defendant

46

used the patented invention not only in support of its FDA submissions, but also, as in *Abtox*, to generate information that it used for marketing and fund-raising purposes, and that these latter uses undermined the § 271(e)(1) exemption. This Court ruled that § 271(e)(1) nonetheless applied. To accept the patentee's argument, "we would have to read into this statute an unspoken requirement that the disclosure of information obtained during clinical trials [using the patented invention] to persons other than FDA officials, although not in itself an act of infringement, somehow repeals the exemption. We do not find that requirement in the words of the statute." *Id.* at 1524. Nor did the Court find any support for such a requirement in the legislative history. *Id.*

In light of this authority, the Court in *Momenta I* was on solid ground when it rejected Momenta's argument, noting that "[w]e have interpreted [the 'solely'] language of the safe harbor to allow alleged infringers to use 'data from tests for more than FDA approval,' such as for fund raising and other business purposes." 686 F.3d at 1360 n.2. So long as the alleged use of the '886 patent's process is reasonably related to the development and submission of information under federal law, the resulting information may be used for other purposes without undermining the availability of the safe harbor.

47

Momenta ignores these cases and the distinction drawn by them between use of a patented process and use of the information generated by use of that process. Its argument is inconsistent with controlling authority and must be rejected.

c.    **Application of § 271(e)(1) in this case will not broadly exempt defendants from infringement liability for commercial manufacturing.**

Momenta warns that if this Court affirms the judgment in Teva's favor, a "wide swath of infringing commercial conduct" will escape liability under § 271(e)(1). Blue Br. at 48-52.  Because FDA requires that records be kept regarding many aspects of the manufacturing process, Momenta says that drug makers will be free to infringe with impunity most patents in connection with pharmaceutical manufacturing activity.

Even if Momenta were correct in its dire predictions, that would be a matter for Congress, not this Court, to address.  The Hatch-Waxman Act, of which § 271(e)(1) is a part, was a compromise in which both brand and generic drug companies obtained certain benefits.[16]   Congress has amended the Act several times to adjust the balance in light of experience.  If Momenta believes § 271(e)(1)

---

[16]    Had the patent covering enoxaparin itself not been found unenforceable, *see Aventis*, 525 F.3d 1334, Momenta would have had to rely on § 271(e)(1) to develop the process claimed in the '886 patent without infringement liability to Aventis.

provides insufficient protection to drug patentees, Momenta and other drug companies have the resources to make their case to Congress.

But Momenta's "floodgates" argument is also significantly overstated because the particular characteristics of the '886 patent make it a *uniquely* suitable candidate for § 271(e)(1)'s safe harbor.   The '886 patent claims a method of generating information as to whether a sample of enoxaparin has certain characteristics essential to satisfy FDA requirements for that product, information that must be gathered as a condition of ongoing FDA approval and submitted on demand to the FDA.   The safe harbor of § 271(e)(1) specifically insulates from patent infringement liability uses of patent that are reasonably related to gathering such information.   It should come as no surprise that § 271(e)(1) applies to the '886 patent.

It does not follow from the application of § 271(e)(1) in this case, that the safe harbor will apply to patents that claim the drug product itself, or its active ingredient, or methods of manufacturing the drug or using it to treat disease.  Even if practicing those kinds of patents incidentally generates information that the manufacturer considers using in an FDA submission, the use of such patents is less directly related to the development of such information than a patent like the '886 patent, which has no purpose other than the development of such information.   It follows even less that § 271(e)(1) will apply to "syringes, pens" and other

equipment that may have many other uses besides gathering information essential to maintaining FDA approval.  *See* Blue Br. at 51.

Under § 271(e)(1), the relationship of the patented invention to the gathering of information for federal regulatory purposes must be "reasonable," and courts regularly draw lines on a case-by-case basis defining the scope of § 271(e)(1)'s safe harbor protection.  The decisions of the Supreme Court and this Court interpreting § 271(e)(1) well illustrate this process.  Recognizing the breadth of the statutory language, early decisions clarified that § 271(e)(1) was not limited to uses to generate information for use in ANDAs, or to information that was relevant only to the Federal Food, Drug and Cosmetic Act, or to information that was actually submitted to the FDA at all.  On the other hand, this Court also recognized in *Classen* that using patented technology after FDA approval of a drug to voluntarily gather information that there was no legal obligation to gather under federal pharmaceuticals law crossed the line and sailed beyond § 271(e)(1)'s safe harbor. In *Momenta I*, the Court made the further distinction that where the FDA required the information to be gathered and submitted on demand, the safe harbor applied to the use of patented analytical methods to gather the information.  There will be other occasions where "reasonably related" lines will have to be drawn.  But Momenta's suggestion that applying § 271(e)(1) to a patent that has no purpose other than facilitating compliance with FDA's information gathering requirements

will declare open season on any patent used by any company regulated by the FDA for any purpose is hyperbolic in the extreme.

## IV. The District Court did not abuse its discretion in denying Momenta leave to file a surreply to respond to Teva's "made by" arguments.

Momenta argues that the District Court abused its discretion by denying Momenta leave to file a surreply to respond to the "new" arguments that Teva is said to have raised in its reply brief that its product was not "made by" the method claimed in the '886 patent. Blue Br. at 61-63. Momenta is wrong. First, Teva's "made by" arguments were made in response to arguments that Momenta raised for the first time in its opposition brief. Second, a district court does not abuse its discretion by denying a party leave to file a surreply to respond to new arguments in its opponent's reply if the court permits the party to later present its surreply position at oral argument — the exact situation here.

### A. Momenta was not entitled to file a surreply because Teva's arguments were made only in response to theories raised for the first time in Momenta's opposition to Teva's motion.

Teva raised its "made by" argument in its reply brief only because Momenta raised the applicability of § 271(g) in its opposition to Teva's summary judgment motion. A3438-A3442; A4761-A4765. Under these circumstances, no surreply brief is required or even generally warranted. "[A] surreply is inappropriate where the arguments made by [the movants] in their reply brief are merely responses to new arguments made by [the opponents] in their response." *Clear Channel*

*Outdoor, Inc. v. Mayor & City Counsel of Baltimore*, No. GLR-13-2379, 2014 WL
2094028, at *7 (D. Md. May 19, 2014) (internal quotations omitted); *accord*
*Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 188 (D.D.C. 2012) ("As Courts
consistently observe, when arguments raised for the first time in reply fall within
the scope of the matters [the opposing party] raised in opposition . . . leave to file a
surreply will rarely be appropriate." (internal quotations omitted)).

Momenta could not have been surprised by Teva's argument.
Section 271(g)'s requirement that a product be "made by" a patented process is
apparent on the face of the statute, and under these circumstances — *i.e.*, a patent
teaching a method that simply generates information and teaches no method of
synthesis — Momenta should have recognized that in relying on § 271(g) to avoid
summary judgment, the "made by" question would have to be addressed.  Indeed,
Teva raised the "made by" issue more than two years earlier (A5182-A5183) and
throughout the litigation (*e.g.*, A824-A830; A3308-3309).  Momenta plainly
should have anticipated that issue when it brought up § 271(g) in its opposition to
Teva's motion.  A3440-A3442.  The District Court faced no obligation to allow
Momenta the last *written* word on the subject.

### B.    Momenta argued all of the matters raised in its surreply at oral argument on Teva's summary judgment motion.

Even if, *arguendo*, Momenta was entitled to a chance to respond to Teva's
"made by" argument, it had that opportunity at the July 1, 2013 oral argument on

Teva's summary judgment motion, as Momenta admits.  Blue Br. at 25; A4836-

A4839; A4841-A4844.  The District Court's refusal to grant Momenta leave to file

additional *written* argument was, therefore, entirely harmless.

In nearly identical circumstances, this Court has found that a district court

does not abuse its discretion when its denies a party leave to file a surreply to

respond to new arguments raised in its opponent's reply brief when "it is clear that

the court gave [that party] an opportunity to present its rebuttal arguments to [the]

new evidence orally."  *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1331-32

(Fed. Cir. 2008) ("Although it is true that [the opponent] was not given the

opportunity to respond on paper, a district court must be allowed to halt the

exchange of reply memoranda at some point.").[17]  It was therefore well within the

---

[17]    None of the case law that Momenta cites in its brief supports its argument
regarding the surreply.  *See* Blue Br. at 61-62.  *Celotex Corp. v. Cartrett*, 477 U.S.
317 (1986), turned on the need for adequate discovery in advance of a summary
judgment motion and is, therefore, inapposite.  Two cases Momenta cites
addressed leave to file a surreply where new *evidence* was presented in the reply
brief, not merely an argument that Momenta plainly should have anticipated.  *See
Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003); *Cia. Petrolera
Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985).
Momenta's final case, *Conroy v. Vilsack*, 707 F.3d 1163 (10th Cir. 2013), actually
supports Teva's position, as the Tenth Circuit found that the lower court had not
erred in relying on allegedly "new" argument in a reply brief; the opponent to the
motion in that case had never even sought leave to file a surreply.  *See id.* at 1179
n.6.

District Court's discretion to deny Momenta leave to file additional written

argument and instead hear oral argument from Momenta on the matter.

Momenta's assertion that the District Court did not even consider

Momenta's surreply arguments (Blue Br. at 62) is baseless; to the contrary, the

District Court heard argument from both parties on Section 271(g) and found in

favor of Teva, expressly rejecting Momenta's surreply position that Teva's product

is made by the patented process because Chemi's quality control testing is

"conducted as part of the broader 'manufacturing process.'"  A7; A4836-A4839;

A4995-A5000.  Under these circumstances, this Court should affirm the District

Court's ruling.

## V.    The District Court did not abuse its discretion in denying Momenta's belated attempt to amend its infringement contentions for a third time.

The District Court plainly did not abuse its discretion in rejecting as futile

Momenta's attempt during summary judgment proceedings to amend its

infringement contentions to accuse Chemi's Building Block Test of infringing the

'886 patent.  A8 (incorporating by reference A4859-A4861).  The District Court

correctly found that, regardless of Momenta's new contentions, the Building Block

Test, like the 1,6 Anhydro Test, was encompassed by the Section 271(e)(1) safe-

harbor.  *Id*.  This Court therefore should affirm the District Court's denial of

Momenta's motion for leave to amend its infringement contentions.  In the

alternative, this Court should affirm because the record shows that Momenta was

not reasonably diligent in seeking to place the Building Block Test into dispute.

### A. The District Court correctly found that Momenta's proposed amendment would have been futile.

A district court acts within its discretion to deny amendments that would be

futile. *See Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 117 (1st

Cir. 2009); *Fortinet, Inc. v. Palo Alto Networks, Inc.*, No. C-09-00036 RMW, 2010

WL 4608250, at *1 (N.D. Cal. Nov. 5, 2010) (denying leave to amend

infringement contentions to include a doctrine of equivalents theory where

patentee was unable to previously articulate a "viable" infringement theory under

that doctrine).  The District Court correctly recognized that the proposed

amendment to challenge a second release test would have been futile because

exactly the same arguments that applied to the 1,6-Anhydro Test, applied as well to

the Building Block Test.  A8 (incorporating by reference A4859-A4861).  Both

tests were performed to generate information that FDA regulations required Teva

to gather and to submit on demand, so § 271(e)(1) applied equally to both tests.

A2746-A2753; A4860-A4861.  Additionally, both tests were performed on

samples taken from batches of enoxaparin that had already been "made," and so no

product sold in the U.S. was "made by" either test, A7, so performing the Building

Block Test abroad likewise cannot trigger liability under Section 271(g).

**B.     The District Court properly rejected Momenta's Third Amended Contentions because Momenta unreasonably delayed filing them.**

Although the District Court rejected Momenta's Third Amended Contentions on the ground of futility and did not address Teva's alternative argument that the contentions should be rejected as untimely, this Court can affirm the decision below on that alternate ground because it is more than fairly supported by the record.  *See Granite Mgmt. Corp. v. United States*, 416 F.3d 1373, 1378 (Fed. Cir. 2005) ("An appellee may rely upon any ground supported by the record for affirmance of the judgment, whether or not the lower court relied on that ground."); *Oxford Aviation, Inc. v. Global Aerospace, Inc.*, 680 F.3d 85, 87-88 (1st Cir. 2012) ("[Appellee] is entitled to defend a judgment on any adequately preserved ground that supports that judgment even if the district judge ignored or rejected that ground."); *see also, e.g.*, *Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258 (Fed. Cir. 1991) (affirming district court's dismissal of plaintiffs' late-added claims on the "alternate ground of the [plaintiff's] violation of Fed. R. Civ. P. 15(a)" due to plaintiffs' undue delay, instead of a violation of Fed. R. Civ. P. 15(c), which had been the district court's basis for dismissal).

The record here reflects a clear lack of diligence on Momenta's part and supports affirming the District Court's decision on the ground that Momenta lacked good cause to add its Building Block Test contention to the case.  Momenta

56

first tried to introduce its Third Amended Contentions on February 28, 2013, seven months after the July 27, 2012 absolute deadline specified in the scheduling order.[18]  Momenta therefore bore the burden of persuading the District Court that "good cause" existed to amend its infringement contentions, which "require[d] a showing of diligence."  Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); D. Mass. L. Civ. R. 16.1(g) ("The scheduling order shall specify that its provisions, including any deadlines, . . . can be modified only by order of the judge, . . . and only upon a showing of good cause."); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006) ("The burden is on the movant to establish diligence rather than on the opposing party to establish a lack of diligence."); *see also In re Papst Licensing GmbH & Co. KG Litig.*, 767 F. Supp. 2d 1, 8 (D.D.C. 2011) ("The good cause standard under Federal Rule of Civil Procedure 16(b) applies to a request to amend asserted claims and infringement contentions.").  In the District of Massachusetts, "[t]o show good cause, a party must demonstrate the 'deadline in the scheduling order *may not reasonably be met, despite the diligence of the party*

---

[18]    The Scheduling Order set two deadlines for the parties to amend their contentions:  up to 30 days before the *Markman* hearing, and, after that, no later than "30 days after the Court's ruling on claim construction."  A588; A592.  The District Court issued its claim construction ruling on June 27, 2012.  A2345-A2347.

*seeking the extension*.'" *House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co.*, 775 F. Supp. 2d 296, 298 (D. Mass. 2011) (emphasis added).

Here, Momenta had ample opportunity to meet the deadline in the scheduling order but simply was not diligent in seeking to amend its contentions. Teva produced the documents describing its Building Block Test to Momenta on June 20, 2011, and that test has remained unchanged since June 6, 2011. A2742; A2829-A2866. After receiving those documents, Momenta had several opportunities to accuse the Building Block Test, including when Momenta amended its infringement contentions on September 22, 2011 and then a second time on July 12, 2012 (A2740-A2741; A2779-A2819),[19] Momenta instead waited until the end of February 2013 — about twenty months after Teva produced the documents describing its Building Block Test (A2742), eight months after the District Court's *Markman* ruling (A2345-A2347), seven months after the close of fact discovery (A2297-A2299), and a month after Teva moved for summary judgment that the 1,6-Anhydro Release Test did not infringe the '886 patent (A2487-A2489) — before it asserted claims regarding the Building Block Test for the first time. A2740-A2743, A2745-A2778. Such delay plainly demonstrates lack of diligence and, if permitted after claim construction and the close of fact

---

[19]    Momenta made this second amendment during the 30-day window after the *Markman* ruling, as permitted by the scheduling order. *See supra*, n.18.

discovery, might compromise Teva's ability to prepare defenses against Momenta's new contentions, develop evidence in support of those defenses, or raise claim construction disputes that could implicate the Building Block Test. A2735-A2737.

For the foregoing reasons, Momenta cannot demonstrate that the "deadline in the scheduling order may not reasonably be met, despite the diligence of the party." *See House of Clean*, 775 F. Supp. 2d at 298 (internal quotations omitted). Momenta's untimeliness therefore provides an alternative basis for this Court to affirm the District Court's ruling rejecting Momenta's Third Amended Contentions.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's (1) judgment that Teva does not infringe any of the asserted claims of the '886 patent, (2) grant of Teva's motion to strike Momenta's Third Amended Infringement Contentions, and (3) denial of Momenta's request for leave to amend its infringement contentions.

Respectfully submitted,

Dated:  September 25, 2014          /s/  Henry C. Dinger

Henry C. Dinger
James Rehnquist
Elaine H. Blais
Emily Rapalino
Robert Frederickson III
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA  02109
Tel:  (617) 571-1000

David M. Hashmall
Joshua A. Whitehill
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Tel:  (212) 813-8800

**_Counsel for Defendant-Appellee_**
**_Teva Pharmaceuticals USA, Inc._**

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2014, I caused the foregoing

document to be electronically filed with the Clerk of Court using CM/ECF, which

will send notification of such filing to counsel of record, and caused to be served

true and correct copies on the following counsel in the manner indicated:

VIA ELECTRONIC MAIL

Deanne Maynard, Esq. (dmaynard@mofo.com)
Marc A. Hearron, Esq. (mhearron@mofo.com)
Brian R. Matsui, Esq. (bmatsui@mofo.com)
MORRISON & FOERSTER LLP
Suite 6000
2000 Pennsylvania Ave, NW
Washington, DC  20008
***Attorneys for Plaintiffs-Appellants Momenta Pharmaceuticals, Inc.
and Sandoz Inc.***

Robert S. Frank, Jr., Esq. (rfrank@choate.com)
Daniel C. Winston, Esq. (dwinston@choate.com)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
***Attorneys for Plaintiff-Appellant Momenta Pharmaceuticals, Inc.***

Thomas P. Steindler, Esq. (tsteindler@mwe.com)
MCDERMOTT, WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, DC 20001
***Attorneys for Plaintiff-Appellant Sandoz Inc.***

Dated:  September 25, 2014            /s/  Henry C. Dinger
                                     Henry C. Dinger
                                     hdinger@goodwinprocter.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

    __X__ The brief contains __13,919__ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

    _____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

    __X__ The brief has been prepared in a proportionally spaced typeface using MS Word in a 14 point Times New Roman font or

    ____ The brief has been prepared in a monospaced typeface using _____ in a ____ characters per inch _____ font.

Dated: September 25, 2014            /s/ Henry C. Dinger
                                     Henry C. Dinger
                                     **Counsel for Defendant-Appellee**
                                     **Teva Pharmaceuticals USA, Inc.**